The next case is United States v. Stewart, number 22-3014. And, Counsel, you can take the podium when you're ready. Thank you very much, Your Honor. May it please the Court, Counsel. I am Randy Zellin, and I am privileged to stand before this Court representing the appellant, Gilroy St.Patrick Stewart. Before you get into it, do you want to reserve some time for rebuttal? I do, if Your Honor please, three minutes. That's granted. Thank you. Please proceed. I have struggled mightily with the notion of how to present an argument to three judges, three human beings, in the backdrop of knowing that there were 22 kilos of cocaine involved in this case. And as difficult as I believe it is, when we try to... The good news is that doesn't matter. And I am so glad... It doesn't matter whether it's 22, 2,000 or an ounce. Your Honor, thank you for making me feel that much better because it is so difficult. Even as Judge Mariani, who was the district judge in our case, in United States v. Gilliam, it was very interesting to see Judge Mariani suppress evidence, but at the same time note, it's okay because he's not getting out anyway. It is so difficult to stand before any court and say, let's ignore the elephant in the room, which are the 22 kilos, and focus in on who should be punished here and who is the lawbreaker such that my client as a lawbreaker gets a break. Because if the Fourth Amendment is anything, in fact it is, standing for deterrence. And I respectfully submit that before this court is a case where 14 seconds into the traffic stop, my client had complied with 60% of the mission of a traffic stop. He had provided a license, a registration, and an insurance card. Eight minutes into the stop, it is clear that the trooper is not concerned for his safety because at eight minutes into the stop, Mr. Stewart, fortunately or unfortunately, exits his vehicle to go look at the license plate frame. And for one hour, trooper testatory would not permit Mr. Stewart to get back into that car. Counsel, I think we've read all the briefs and we're very familiar with the facts here. But your adversary points out, hey, and you recognize it as well, we've got to look at the totality of the circumstances, as did the district court. Are you engaging in a, as our opinions have said, a divide and conquer approach? You know, going through each of the points of suspicion and pointing out, well, there's a reasonable explanation for this or this is not a viable reason. The divide and conquer analysis, if Your Honor please, is somewhat troubling because when we talk about are we eliminating a substantial number of innocent motorists, for example, who drive on Route 80, in this particular case, it's not divide and conquer. It's a matter of if you look at every single factor up until approximately 13 to 14 minutes into the stop where clearly the trooper deviates from the mission of the stop by looking at criminal history and trying to determine whether or not my client has a criminal history. Each and every observation of the trooper, it's almost like a heads I win, tails you lose. My client was nervous. Well, if you're too nervous, you must be doing something wrong. If you're not nervous enough, you're doing something wrong. If you have too much luggage, that's an indicator of some kind of hard travel. If you don't have enough luggage, then clearly you're doing something illegal. It seems as if you make eye contact, then you are guilty of something. If you don't make any eye contact, you're guilty of something. It seems that no matter what you do, law enforcement seemingly comes up with, as my mother used to say, may she rest in peace. You've got an answer for everything, and it seems that there is an answer for everything. Your counterfactuals are strong policy arguments, but they're divorced from the facts of this case. So I think we need to dive in respectfully to the facts of this case. Isn't it true that your client gave evasive, inexplicable, odd answers very early on in this traffic stop? And let me try to, so I'm not hiding the ball on you, tell you exactly what I'm focused on. You've got a client who lives in Cleveland, but he's driving a car registered in New York, correct? Yes. Okay, and two minutes into the traffic stop, the trooper asks, in reference to the New York registration of the car, where's Baldwin at? I've heard of it, but I can't place it on the map, though. You know where Baldwin is. Stewart replied, you know where Baldwin is. You know where Baldwin is. A rather bizarre response, no? Your Honor, certainly it could be viewed that way, but I think that presented an opportunity for trooper testatory, like we saw in United States v. Clark, and I believe also in United States v. Green. The trooper, for the hour and 20 or hour and 30 minutes that he had Mr. Stewart detained, he had the opportunity, if he chose to, to verify whether or not the information was accurate. He had no prior dealings with Mr. Stewart. This is not like in Green where trooper Volk had run into Mr. Green now for the second time. We don't know what Mr. Stewart's proclivities are, how he reacts when he is nervous. It doesn't necessarily mean he's hiding anything. And, again, I say that knowing that, in fact, he was hiding something. But if we somehow could, that men in black moment where you flash the thing and you have no idea that there were 22 kilos in the car and, in fact, we suspended that and we merely looked at it. Oh, Judy, we get that. Again, it seems that you're deflecting from the true facts of the case. We've got other odd things going on here. The aunt owns the car, supposedly, right? Yes. And the car is registered to Baldwin, New York. Yes, and she lives. And at the 8-minute mark, 8.30, Stewart says, my aunt, she lives in Cleveland. Yes. So she has a car registered in Baldwin, New York, but she lives in Cleveland? He also, though, Your Honor, says that she lives in Baldwin also. She's got two residences. In fact, you'll recall that Mr. Stewart says, you can't own anything in New York. So, no, that in a vacuum, there's nothing unreasonable about it. And, again, the trooper had every opportunity to say, well, let me call Aunt Hazel, let me call Hazel Sparks and let me verify that you are allowed to use this car, that she has two residences, one in Cleveland and one in Baldwin, and that, in fact, she owns a nursing home in Cleveland, and, in fact, she has a niece that goes to school in New York. All right. And what about when the trooper asks Stewart, where did you stay in New York? His immediate response was. How about, you know, I have an apartment there. I live there. I have a house there. I have friends there. Instead, the answer is, I have family in New York. Again, it's a non-answer. And, in fact, his first answer was he spoke about where his daughter was living. So I agree, but if Your Honor. She did get that right, though. But, if Your Honor, please, being nervous or not really necessarily digging this interaction with a trooper is, in and of itself, not necessarily an indicator that he has committed separate and apart criminal activity, which truly is what we're talking about. Well, you're right about that. It's certainly not proof that he's committed criminal activity. But, unfortunately for your client, that's not the standard. We're dealing with reasonable suspicion, right? Correct. What I'm suggesting is that, you know, this case has some similarities to Green. A lot of the factors are present here. You've got misleading statements. You have a criminal record. You have tinted windows. What you don't have in this case that did occur in Green, as I recall, is the smell of drugs. And that's a powerful one in Green. And, in fact, the court extrapolated. I think that's the right term that I want to use. Extrapolated the first encounter to the last encounter, reminding us that the smell of the burnt marijuana created that reasonable suspicion when Mr. Green gave, when we talk about really a ridiculous response. But, again, to the Chief's point, it's not any one thing. In all these cases, we have to look to the totality of circumstances. Yes. Right. So, in some cases, you know, to the argument you were making earlier, looking a little nervous, having an air freshener in the car, et cetera. In some cases, that's just not going to be enough for reasonable suspicion because a whole bunch of people who aren't doing anything wrong might be nervous in a traffic stop. They might have an air freshener because they like the smell and want their car to smell good. Steph Curry had an air freshener hanging from his $400,000 Lamborghini truck in the documentary. So, but here, you know, so what we really need to do is look at every one of these facts in their totality in order to determine whether there was reasonable suspicion by the 15-minute mark. That's what we're about here, right? And, actually, it could even go closer to the 1349 mark. But I think the... And, also, we have to look at it in light of the officer's experience as well. And he's got some pretty significant experience, particularly on I-80 and drug interdiction, right? But I think, and that becomes both a blessing and a curse, I would respectfully submit, because it's pretty clear, and to his credit, he readily conceded, I do my own way. I do things my own way, and I think that becomes a problem in the eyes of the law because, listen, I will not be so bold as to say, Your Honors, please, let's create some bright line because trying to navigate our way through Rodriguez and trying to navigate the Rodriguez moment and trying to navigate what is reasonable suspicion when you hit the point that the mission of the stop has been completed, yes, it would be nice to have a bright line, but, certainly, the trooper demonstrates to us that there is equally something wrong with a trooper just saying, Listen, I do what I want to do. It's pretty clear, if I were to be intellectually and from my heart honest. Trooper Testatori was going to get into that car the moment he approached that minivan, and he was going to get into that minivan one way or the other. Well, I don't know. To use your language, that's a bit of a hunch, isn't it? And that's exactly why I respectfully submit the 22 kilos should disappear into the evening. That's a hunch on your part that he was going in regardless, right? Well, I think he did testify that within a minute or two, and I think Judge Mariani also indicated very, very early on in Judge Mariani's view, the reasonable suspicion was there, and I would respectfully submit it was not there, and, in fact, the honesty of Trooper Testatori, I think, belies the fact that he was on a mission, and that mission was not a traffic stop. That mission was to search that vehicle for contraband, and he had plenty of time, again, to verify Mr. Stewart's statements. He also had plenty of time to say, Mr. Stewart, you're free to go, but your minivan isn't going anywhere, and we're going to get a warrant to search the minivan, and then I wouldn't be standing here right now. But for close to an hour and a half, Gilroy said get the warrant. Any probable cause, and isn't it clear that reasonable suspicion is something less than probable cause? Absolutely, but to the extent that the dog sniff would have created the probable cause or he could have gotten the probable cause elsewhere or, again, and I don't want to start divining things, but the point remains he didn't get a warrant. He made no effort to get a warrant, and Mr. Stewart was detained from approximately 6-28 until approximately 7-39 when the canine appeared, and I would respectfully submit under Rodriguez that is way, way, way too long beyond what is a permissible detention. I believe I've exhausted my time, Your Honors. May it please the Court. Christian Hogsby on behalf of the United States. To pick up on something that Mr. Zellin said at the end of his argument, under Rodriguez this was way too long. It would be a mistake to interpret Rodriguez as setting a time limit on the permissible duration of a traffic stop. What Rodriguez did was to say that when an officer veers off mission from a traffic stop, he must have had reasonable suspicion in order to do so. And in this case, Trooper Tessitore had ample reasonable suspicion almost from the outset. When did he get it? Judge Hardiman, I think in this case, as this Court has identified in numerous cases, it's difficult to identify precisely when that moment is, but I would submit that even within the first couple of minutes when he made contact with Mr. Stewart, he had observed a number of factors that contributed in some measure to his growing reasonable suspicion. The first of which was just the state of the van itself, the heavily tinted windows, the sun shading screens pulled up in the back, the presence of an air freshener. All right, so you've got two traffic violations that are uncontested. You've got the tinted windows and the obscured license plate, right? Is it your argument that that was enough right there to put the dog on the car? No, Your Honor. Okay, then what were the plus factors beyond that that gave him the right to go beyond the mission of the traffic stop? Yes, Judge Hardiman, I believe that the most significant factor is Mr. Stewart's story about the vehicle itself and the fact that he was driving a third-party vehicle registered in the state of New York when he himself presented a driver's license indicating that he lived in Cleveland, Ohio. Within minutes of that, of Trooper Tresitore's discovery of that information, the story got even more confusing because Mr. Stewart indicated that his aunt, who had a car registered in the state of New York, in fact lived in the city of Cleveland, Ohio, where she owned a business but then used that vehicle to drive back and forth to the New York City area a distance of some 500 miles, which is just a very sort of strange observation. And I don't mean to give the impression that every piece of reasonable suspicion or every factor that may have contributed to Trooper Tresitore's reasonable suspicion is of equal weight. I think it's, as counsel was arguing, driving on Interstate 80 alone. One need only watch the traffic stop video to realize that hundreds of cars are whizzing by Trooper Tresitore and Mr. Stewart during the course of the traffic stop. The fact of an air freshener sitting by itself in a vehicle, likely not reasonable suspicion. Does that have any weight at all, really? I mean, the non-presidential opinions that you pointed to involving air fresheners involved hordes of air fresheners and overwhelming odors of air fresheners in cars. This is a single air freshener hanging from the rearview mirror. Should we give that any weight? I think it's entitled to some weight, Judge Freeman. I think that if we consider the factors that went into the totality of circumstances facing Trooper Tresitore and what's now facing this court in determining whether or not they amounted to reasonable suspicion, it's a smaller stone in a pile. There were certainly some much larger stones, including the third-party vehicle, the confusing travel history that Mr. Stewart provided, the further confusing information regarding his aunt's residence in Ohio and her use of the vehicle. But you indicated some non-presidential decisions. I note that in Garner, the presence of air fresheners, albeit multiple air fresheners, was identified as a factor. And there are numerous other decisions of this court and lower courts recognizing that the presence of air fresheners taken in the context of a trooper's experience in judgment may be a factor. So yes, Judge Freeman, I believe it's a factor that should have some weight, but I'm not here at the podium to argue that the presence of an air freshener hanging from a rearview mirror would itself supply reasonable suspicion. Can I take you to the timing question? We need to identify, or at least presume, what the Rodriguez moment would be. I understand the district court thought it was around the 15-minute mark when the officer said that he was going to issue a warning. Your friend mentioned maybe an earlier point when the officer started looking for criminal history. What is your position on the Rodriguez moment? Judge Freeman, we've maintained that Judge Mariani got it right by choosing the earlier of the three moments that Mr. Stewart identified in his motion to suppress. It sounded during argument here today that there was a suggestion that the Rodriguez moment may have actually occurred much earlier. And I think that the important thing to focus on here, and it really is teased out in the court's decision in green, is the difficulty of identifying what that moment is. I think it can be tempting to look at, well, when did he have all the reasonable suspicion? And we'll peg the Rodriguez moment at that point. I think what Rodriguez says, and I believe what this court was explaining at some length in green, is you really need to focus on when did the officer go off mission of the traffic stop. And in this case, I think that that earlier 15-minute mark, and I know we're being approximate here, but when he told Mr. Stewart, I'm going to issue you a written warning, I think it's fair to peg it there. But isn't this an easy case? I mean, when an officer makes a pronouncement, I have decided what I'm going to do. I'm either going to issue you a warning, or he could have said, I'm going to give you a ticket, or I'm not going to give you a ticket. If there's a specific pronouncement, can that be the clear Rodriguez moment? Well, again, as my counterpart argued, I think that it's difficult to peg a specific moment, as tempting as it is to establish bright lines. But in this case, I think that that is a reasonable place to identify. I think that is what the facts demonstrate here, Your Honor, is that when he had indicated that he was going to be issuing the warning, he was already vested with reasonable suspicion, and was therefore, under Rodriguez and this Court's precedent, justified in extending that traffic stop temporarily to resolve that reasonable suspicion. Let me ask you a question about, a factor was his quote-unquote criminal history. I take it, and I'd like you to address it, because apparently there was only an arrest, and it just involved the DEA. It wasn't a possession or anything like that. It was a money laundering, not that that's something that's not serious, but that apparently led to his reasonable suspicion. Is that appropriate? I don't know that I would say it led to his reasonable suspicion. Well, all right, it's a factor he cited. It is a factor he cited, and under this Court's precedent, it is a relevant factor. In fact, I believe this Court said, I believe it was in Green, it may have been in Garner, I may have spoken to, but Green for sure, where the Court, I believe, said that the mere arrest, particularly where that arrest is for the matter for which the officer or trooper has reasonable suspicion, in this case drug trafficking, where it relates to that criminal activity that is suspected, that it takes on added significance. And the Court in Green said that the fact of a prior arrest would contribute meaningfully to a finding of probable cause. And if it can contribute meaningfully to a finding of probable cause, it certainly is relevant as a stone in the pile in the reasonable suspicion calculation. If he had been arrested for money laundering by an agency other than the DEA, let's say the FBI, would it still have relevance? I believe it would, Your Honor. Again, I think that information is somewhat limited. There's some limits to the information that the trooper is obtaining when it indicates an arrest for money laundering. What it related to is not necessarily clear. Judge Mariani, I think, addressed this issue fairly persuasively in his decision, where he pointed to cases indicating that it's relatively well known that often money laundering relates to drug trafficking. And so, again, it's the totality of the circumstances here. It's a factor that contributed to Trooper Tessitore's mounting suspicion that really began at the moment he made contact with Mr. Stewart at the driver's side window, which was just about a minute and 30 seconds into what's captured on the video that's been submitted to the Court. Again, I think you touched on this earlier, but I think that Mr. Stewart continues to urge the Court to engage in what the Court has steadfastly resisted and what our visu, the Supreme Court's decision said the Court should not do, which is engage in a divide-and-conquer approach to these factors. Again, I'm not here to argue that each of these factors standing alone is inherently suspicious. The fact that a motorist is driving from New York City is not inherently on its own suspicious. The fact that someone is driving to their home in Cleveland, Ohio is not standing alone suspicious. The fact that the travel takes that individual along Interstate 80, an interstate that runs the length of this country, is not in and of itself suspicious. And the fact that that car might have an air freshener in it is not in and of itself suspicious. But when you start to aggregate these factors and layer in the fact that he is driving a third-party's vehicle, he is driving a vehicle that is registered in the state of New York, he then tells the trooper that he is driving that vehicle and obtained it for a few days from his aunt in Cleveland, where she happens to live, even though her vehicle is in New York. Does it matter what kind of third-party vehicle? Do you see a distinction between rental cars and loan family cars? In terms of its contribution to the reasonable suspicion, Judge? I think it could be, potentially. Which is worse from the defendant's standpoint? Rental car or aunt's car, brother's car, next-door neighbor's car? I don't know if I would say worse, Your Honor. I think it would really depend on the facts and circumstances of that particular case. I think other factors would bear upon the weight that would be provided to... Why isn't the answer that the type of third-party vehicle really is irrelevant? What's relevant are the answers to the questions regarding why the driver has the third-party vehicle. Wouldn't that be the sounder rule, if we're focused on totality? In other words, a person's in a rental car, trooper asks a straightforward question, motorist gives an evasive answer. There could be another case where the motorist says, it's my buddy's car, he's a high school friend, I borrowed the car. If the answers to the questions are direct and clear and make sense, why wouldn't it be more about the interaction between the law enforcement officer and the motorist, rather than the status of the vehicle? I'll try to answer it this way. I think what your question is getting at is, are the answers to the questions important? Certainly from the government's perspective, they're very important. I've argued here this morning and in the brief that Mr. Stewart's answers to trooper Tessitore's questions added considerably to the suspicion. You could take Clark. I think what happened in that case was that the motorist was stopped. He was unable to produce a copy of the vehicle's registration. He indicated that the vehicle belonged to his mother. The officer had ran the information and indicated that it was registered to the driver's mother. In fact, I believe the mother was even on the phone at one point. That really sort of resolved that issue about driving a third party's vehicle, Judge Hardiman. I think that other factors that can become known during the course of that stop, either through answers or through other information that's supplied, could either aggravate or mitigate the importance of driving a third party vehicle. But what's also important is that, as this Court's emphasized many times, is that the relevance of these factors also needs to be viewed through the prism of a reasonable, experienced officer who brings training and experience to bear on the importance of these factors. In this case, trooper Tessitore talked about the use of third party vehicles, the relevance of window tinting, the relevance of an air freshener, the relevance of the fact that the travel was on a known drug corridor, known to him as a drug corridor, based on prior interdictions. So it's not merely that the answers supplied provide the basis for the suspicion, but they can contribute to, or perhaps in some cases lessen that suspicion, depending on the information that is obtained. Is that responsive to your question, Judge? Did you have a question, Judge? I did, though. Okay. I'll just address briefly. We have pegged at 15 minutes, as Judge Mariani did, the Rodriguez moment. At that point, it was Trooper Tessitore's plan to request consent. I will just note briefly, before my time expires, that based on this court's precedent, it was reasonable for Trooper Tessitore to radio for a trooper. I would also emphasize the record shows no lack of diligence by Trooper Tessitore, which is significant when considering the duration of this stop. He radioed multiple times to ensure the presence of a backup trooper. He immediately requested consent to search the vehicle. When that consent was denied, he immediately radioed for the dog, and the dog, the record in the appendix indicates that the trooper arrived as earliest opportunity with the dog. So I would just emphasize that from that Rodriguez moment forward, the trooper acted with dispatch and in accordance with his training and experience. We're asking for the court to affirm the district court's judgment. Thank you. Thank you, counsel. And we'll hear from your friend in a little while. Thank you. Thank you, Your Honor. Trooper Tessitore, in divining the level of his reasonableness, had the opportunity, if he chose to, and I would respectfully submit that he consciously chose not to, take any steps to verify any of the information that Mr. Stewart provided. Again, as we saw in Green, where the trooper called Enterprise Rent-A-Car to find out whether or not the car had been validly rented, because we recall in Green part of the reasonable suspicion was the fact that there were no barcode stickers on the vehicle, and in fact the rental agreement had expired. So what does a reasonable law enforcement officer do? Verifies the story. I can't help but wonder, in your honors, what we would do. Do you think he needed to call Aunt Hazel? Certainly that would have gone a long way to determining whether or not Mr. Stewart's story has been characterized as strange or nonresponsive or evasive. Had he called Aunt Hazel and said, do you have a nephew, Gilroy? Yes, I do. Do you live in Baldwin and Cleveland? Yes, I do. Do you own a nursing home? Yes, I do. Did you give him the car so he could take your niece to college in New York? Yes, I did. Now suddenly none of what Mr. Stewart says is evasive. It sounds like the rule you're proffering is more intrusive under the Fourth Amendment. You think everybody who stops on interstate highways driving a third-party vehicle, you think the troopers should, as a matter of course, be dialing up the putative owner of the vehicle? That seems very invasive and intrusive, isn't it? Well, only if the trooper is concerned, and we are all concerned about getting to the truth. Imagine, again, how different this would be had Trooper Tessitore gone and done that, no more than I can't help but wondering, let's pretend that Trooper Tessitore found nothing in the vehicle. Would we be looking at the situation and saying, you know what, he had enough there, or would we be saying this was a terrible thing that Gilroy's St. Patrick Stewart was subjected to, and I would respectfully submit it's the latter, again, particularly when there was plenty of opportunity for the trooper. He certainly went out of his way to look into my client's criminal history, which is a deviation from the mission of a traffic stop. It's pretty clear that he called for backup on a number of occasions, not for purposes of his safety for the VTL stop. Is that that unusual? I thought when someone gets stopped and you present your license and registration, it's sort of standard operating procedure. I thought that's what they're doing for five minutes when they're back in their vehicle. They're running the plate. They're running the license. They want to make sure it's all copacetic. And in the course of running that information through their computers, if you have any priors, they're going to pop up. Yes, but in fact, in this particular instance, Trooper Tessitore was on a mission and it had nothing to do with the traffic stop. The fact that he allowed and actually forced Mr. Stewart to remain outside of the vehicle, which I would respectfully submit, which would probably be the least safe place for Trooper Tessitore, safety now is no longer part of the mission. And quite candidly, the fact that he had called for backup after he forced Mr. Stewart to remain outside of the car is, again, a window into Trooper Tessitore's mindset. This was not about the vehicle and traffic stop. It was about his determination to search that vehicle one way or the other. And he did not have reasonable suspicion in order to permissibly extend the duration of that traffic stop. And, again, if there was any question in his mind, a man he had never met before, had no reason not to believe if he had questions, I would respectfully submit the stakes being this high. On balance, it would not have been invasive in the least to at least make the effort to verify the story. If he can't get a hold of Aunt Hazel or Aunt Hazel is not home or doesn't wish to speak to the Trooper, then at least we can all say I tried and I was diligent. So for all that he was diligent, there was a moment where he could have been diligent and I might not be standing here. Your time is up, counsel. Your Honor, thank you very, very much. Thank you. We thank counsel for their excellent argument today and their excellent briefing. And we will take this case under review.